BENJAMIN MORDECAI, plaintiff in error, vs. JAMES STEW-
ART, defendant in error.

NOTE. WARNER, C. J. did not preside in this case.

Where parties made an agreement by which one pays and the other re-
ceives a certain amount, which is entered as a credit on a promissory
note, the note is extinguished *pro tanto*, and the remainder due upon
the note, stands unaffected by the entry of the credit. The amount
thus credited cannot be enlarged, in the absence of any agreement of
the parties so as to extinguish a greater nominal amount of the note
than the amount named in the credit.

Foreclosure of Mortgage. Scaling ordinance. Motion to
dismiss Bill of exceptions. Tried before Judge VASON. Sum-
ter Superior Court. December adjourned Term, 1866.

BENJAMIN MORDECAI filed his petition against James
Stewart for a foreclosure of a mortgage, which was a con-
ditional conveyance of certain lots in Americus in said county,
and given only to secure the payment of a certain promissory
note for $44,000, dated 8th January, 1863, and due twelve
months after its date, with interest from date, made by said
Stewart, payable to the order of A. S. Cutts, and endorsed
by Cutts to plaintiff.

The rule *nisi* was issued and duly served. At October ad-
journed term, 1866, defendant by his attorneys H. K. McCay
and W. A. Hawkins, plead that this was a contract within
the (scaling) ordinance, and prayed a verdict accordingly.

At said term the case came on to be tried.

Plaintiff moved to continue the case upon the following
showing by James J. Scarborough, one of his attorneys. He
stated that at the regular October term, 1866, the case was
called by Judge Speer then presiding; that not knowing
there was any defence, he took a rule absolute for foreclosure,
and Judge Speer struck the case from the docket; afterwards
and during the term, H. K. McCay, Esq., an attorney of the
Court, announced that W. A. Hawkins, who was absent from
the Court by leave of the Court, had been employed as attor-
ney for the defence; said rule absolute not having been

Mordecai *vs.* Stewart.

spread upon the minutes, plaintiff's attorney withdrew the order absolute; he had not been notified that there was any defence to said case, and had not prepared his case for trial, as he had considered the case had been continued for the term; that the plaintiff lived in Charleston, South Carolina, and they were not ready for trial, because they needed plaintiff there.

The Court refused to continue the case, and plaintiff excepted and assigns said refusal as error.

A jury having been empaneled, the plaintiff read in evidence his said mortgage and note.   The note had endorsed on it, a credit of $15,325, dated 17th March, 1866.

Plaintiff closed.

The defendant offered in evidence the following letter. Plaintiff's attorneys admitted that it was written by plaintiff, but objected to its being read.   The Court overruled the objection.

.BANK OF THE STATE OF SOUTH CAROLINA,
*Columbia, December,* 1862.

A. S. CUTTS, Esq., Americus, Ga.,

*Dear Sir :*—Your favor of 16th inst. received.   I will accept the proposition made me, viz: that Mr. Stewart will give me a mortgage upon the property proposed, provided it is worth the amount he proposes to secure me for, and that it is covered by insurance and said policy assigned.   Should I have occasion to sell property to reimburse myself, and it falls short of the amount of his indebtedness, I shall of course expect to hold him for the balance.   I understand this to be his proposition.

The balance of ($50,000) fifty thousand dollars, I shall be willing to take the titles of the Georgia and Pensacola Railroad for fifty thousand acres of land, as stated in your letter. This I understand to be your meaning, which gives me pleasure to comply with—with this understanding, I will be with you the first week in January next.   I cannot be with you before.   If in the meantime, you make sales of any of the land, you can account to me when I see you.   When I leave

here, I will deposit the bonds with the South-Western Railroad Bank, subject to my order, in favor of Houston Pt. Write me if this is our understanding.

Your obedient servant,      B. MORDECAI.

The defendant then introduced said A. S. Cutts, "who was the alleged meritorious defendant." Plaintiff objected to him on the ground that he was incompetent. "Defendant deposited costs, and the Court allowed him (Cutts) to testify, not as a party, but upon a release of and depositing the cost."

He testified that the $44,000 note and mortgage were given for Pensacola Railroad bonds, (and identified a bill of particulars or sale, hereinafter set forth,) and that said bonds were at the time, selling in Confederate money at eighty cents in the dollar. These bonds had been sold by witness to Mordecai at seventy cents in the dollar before the war, and witness had been paid for them by Mordecai at this rate. By getting these bonds from Mordecai, witness obtained possession of fifty thousand acres of Florida lands, then and now worth two dollars and a half per acre, though witness insists he had a legal claim to these lands, and as he believes, could have compelled the Company to give him possession of them, if he had had time to do so.

A payment was made of $15,325 in Florida lands, at two dollars and a half per acre, about the value of said lands. Twelve thousand, six hundred and nineteen (12,619) acres of said land being at said rate, paid partly on some other claims of Mordecai.

The transaction was a Confederate one, made at the time it purports to be, on the bill of particulars. The twelve thousand and odd dollars were paid in Confederate money. The $50,000 were soon thereafter paid in Confederate money, as is stated in the bill of particulars. The land before the war, was worth $2.50 per acre in good money. The land was no part of this purchase. He bought the bonds to avoid litigation with the Railroad Company about the lands, as he was in the war and embarrassed at home, and could not attend to a settlement with the Railroad Company.

The other claims of plaintiff, on which payment was made at the time of credit on the note, were not connected with this claim. Fifteen thousand, three hundred and twenty-five dollars' worth of said Florida lands, was paid on this note. These were the lands the possession of which was obtained as above stated.

The reason why witness did not before make any resistance to the payment of this debt and the other debts, in which he claims there was usury, is because he was in the army and embarrassed at home, and would have done anything, not involving principle, to save Mr. Stewart, his friend, and prevent litigation. The consideration of the note was as stated, Georgia and Pensacola Railroad bonds.

The defendant then identified the following paper as the original bill of sale, and offered the same in evidence.

It was objected to by plaintiff, and the objection was overruled by the Court.

COL. A. S. CUTTS,

Bought of B. MORDECAI.

1863, *January* 6.

| | | |
|---|---:|---:|
| To 220 Ga. & Pensacola (220) R. R. Bonds, $500 each @ 80c. | $88000 | 00 |
| " 220 Coupons payable 1st July, 1861, $20...... | 4400 | 00 |
| " Interest on same to 6th January, 1863,......... | 357 | 56 |
| " 220 Coupons, payable 1st July, 1862, $20 each, | 4400 | 00 |
| " Interest on same to 6th January, 1863,......... | 181 | 86 |
| " 220 Coupons, payable 1st Jan., 1863, each $20, | 4400 | 00 |
| " Interest to 6th January, 1863,................... | 587 | 00 |
| | $106679 | 19 |
| Deduct Cash,.................................... | 12679 | 19 |
| | $ 94000 | 00 |
| Mortgage,....................................... | 44000 | 00 |
| | $50000 | 00 |

Here defendant closed.

Plaintiff, in rebuttal, introduced as a witness, CHARLES W. CHARLTON, who testified that in September (then) last he

proposed to purchase from defendant the hotel lot and build-ing covered by said mortgage; that defendant refused to sell, or to agree to sell, until Col. Cutts had agreed to advance $7,000 to Stewart in place of $7,000 to be paid to Mordecai to release the mortgage on said hotel and lot. The parties, CHARLTON, STEWART and CUTTS, requested C. T. GOODE, Esq., attorney for MORDECAI, to write to him and get author-ity to release the mortgage on said hotel, on payment of $7,000 and a mortgage on one thousand acres of Missouri land, (its estimated market value,) which was done. The parties calculated with Colonel GOODE, the market value of the other property embraced in the mortgage, and all the par-ties came to the satisfactory conclusion that there would be just about enough property to pay the amount of the mort-gage. Colonel Cutts agreed to reimburse Stewart for $7,000 purchase money which was to go to Mordecai, in case he could not arrange with Mordecai; but the extent of the un-derstanding on the part of Cutts, was merely to release the property from the encumbrance of the mortgage in some way.

Plaintiff then identified the agreement alluded to by Charl-ton, and read the same in evidence as follows:

GEORGIA, SUMTER COUNTY,

Be it remembered, that it is hereby agreed and covenanted between James Stewart and Charles W. Charlton, of said County, that said Charles W. Charlton is to pay to said Stew-art $7,000 on the first of January next, if practicable for him to do so, and at all events by the first day of March next; and also to convey to said James Stewart good and sufficient titles to one thousand acres of land in the County of Dunkirk in the State of Missouri, near the county site, Kennett; and the said James Stewart, in consideration of the payment of said sum of money and the conveyance of said land, hereby obligates himself to make good and sufficient titles to said Charles W. Charlton, conveying to him free and unencum-bered, the town property known as Stewart's Hotel, now oc-cupied by W. D. Stewart, together with the lot upon which the Hotel is constructed, said title to cover both the lot and

Mordecai vs. Stewart.

the building.   It is understood between the contracting parties, that in case the hotel building should be injured or destroyed by fire before said Charlton receives possession, (which he is to have by the 1st January next,) then so much of this instrument as relates to the conveyance of the hotel building and said Missouri land, is to be void,—it being the intention of the parties, that the Missouri land shall pay for the hotel building.

> JAMES STEWART.   [SEAL.]
> *per* W. D. STEWART.
> C. W. CHARLTON.   [SEAL.]

Signed, sealed and delivered in presence of us, this 20th September, 1866.

> ALEXANDER KING,
> F. M. COKER, *Notary Public.*

Plaintiff also read the endorsement on said instrument as follows: "In accordance with instructions from Mr. Benjamin Mordecai, who holds a mortgage on the hotel lot and building within described, we hereby, as his attorneys, agree to release the mortgage upon the payment to us of $7,000 between the first of January or the first of March next, and a receipt of a mortgage upon one thousand acres of Missouri lands, this 20th September, 1866.

> SCARBOROUGH & GOODE,
> *Attorneys for B. Mordecai.*

Plaintiff then examined as a witness, MATTHEW R. STANSELL, who testified that in December, 1862, and January, 1863, corn was selling in Confederate money from $1.00 to $1.50 per bushel, and bacon from 18 to 22 cents per pound, less than the present prices in greenbacks; he bought and sold these articles at that time; the rate for gold was three for one, and merchandise was higher than gold.   In 1864, gold was twenty for one, corn $7.00 per bushel, and meat at $3.00 per pound.

Plaintiff then introduced WILLIAM D. STEWART, who testified that at October Term, 1866, James J. Scarborough, one

of plaintiff's attorneys, had witness called, and Scarborough asked him if he or his father had any objections to making said Rule *nisi* absolute, and witness told Scarborough that neither he nor his father had any defense that he knew of— he was his father's agent. He had a conversation with plaintiff in 1866, and plaintiff said the note and mortgage were given for a Confederate consideration, for $88,000 bonds, rated at 80 cents in the dollar, Confederate money.

JAMES J. SCARBOROUGH testified for the plaintiff, that on the 17th March, 1866, when $15,325 were paid on said note, Colonel Cutts sold to plaintiff twelve thousand acres of Florida lands in the Counties of Columbia and Suwannee, (as witness believes,) at $2.50 per acre, and a bond or inchoate deed was taken from Cutts to plaintiff—no number, township or range was mentioned therein; that Cutts had a plat of the lands, with some that had been sold marked upon it; that plaintiff was to have his choice of the unsold lands, and to send an agent to examine them within two months, and then Cutts was to make a deed describing the lands; that plaintiff or his agent had not, within his knowledge, made said selection; and that he had no doubt, if he had done so, Cutts would have executed the proper deed; and that the amount of the lands by Cutts sold to plaintiff, was $30,000, a portion of which was applied to other claims against Cutts, and $15,325 applied as a credit or partial payment on the note secured by the mortgage.

Here the evidence closed.

After argument had, plaintiff's attorneys requested the Court in writing to charge the jury:

1st. That the (Scaling) Ordinance relied on is unconstitutional,—the Legislature and not the Convention being the law-making power; and the Convention had no right to pass said Ordinance.

2d. That if that be not so, if the jury believe that the note and mortgage were given for Georgia and Pensacola Railroad bonds which Cutts bought of Mordecai, by which Cutts obtained title to near or about one hundred thousand acres of

Florida lands, worth $2.50 per acre, then the note and mortgage are not intended to be included within the ordinance.

3d. That if the jury believe the note and mortgage were given for Georgia and Pensacola Railroad bonds, which were of value to Cutts, the consideration is a valid one, the law not looking closely to the quantum of consideration, so it is lawful and of value to the defendant.

4th. That the value of Confederate money, under the proof in this case, (has nothing) to do with the question before the jury.

5th. That there is no want or failure of consideration plead, and defendant must abide by his plea or answer.

6th. That in relation to the payment of $15,235 on the note, it is an executed partial payment for that amount only, and no part of it can be carried over or against the balance due on the note, unless there was an agreement it should be accepted in full payment; and further, said payment is evidence of a good, valid and subsisting debt at the time it was made.

During the trial Mr. Goode, one of defendant's attorneys, verbally requested the Court to charge the jury, that if the bonds, the consideration of the note sued on, were worth at the time the note was given, as much as the face of the note calls for in greenbacks, then the jury should find for the plaintiff; and that if the bonds, at the date of the sale and note, could have been sold for $44,000 in Confederate money, and Cutts, with that Confederate money, could have purchased more of the usual commodities of commercial traffic than plaintiff can now do with greenbacks,—that the verdict of the jury should be for the (amount) claimed by the plaintiff.

The Court refused to charge as requested, in writing or verbally, (except as hereinafter stated,) and plaintiff excepted and assigns such refusal as error.

The Court charged the jury as follows: " The defendant sets up that this mortgage debt has been paid or discharged, and to show this, he sets up that this is an unexecuted contract, made during the late war, and is subject to be scaled

Mordecai *vs.* Stewart.

according to the provisions of the act of the Convention of the State of Georgia. If you are satisfied, from the evidence, that the intention of the parties was that this debt was to be paid in the currency then in circulation, then you have the right to scale the debt and fix the amount (of the debt) at this time in our currency.

" The rule to be adopted by you in fixing this amount under said ordinance, depends upon the view you may take of the facts of the case. If you believe it was the intention of the parties that plaintiff took the risk of the rise or fall in the value of Confederate money from the making to the maturity of the note, then you ought to execute the contract as near as you can; as the contract matured 1st January, 1864, if defendant had tendered the Confederate money at that time, and plaintiff had refused to receive it, this would have been a discharge of defendant; but as it is not pretended here that there was a tender, then the plaintiff is entitled to so much in the present currency as is equal to the value of the amount in Confederate money at that time.

" To find out the value of Confederate money at that or any other time, you may either take the brokers' rate of gold in Confederate money, with the discount or depreciation of our paper currency added thereto, or you may take any other standard furnished to you by the evidence in this case. For this purpose, I have allowed testimony to go before the jury, proving the value of corn and other property. You can, if you please, deduce the value of the currency at that time from this source. But should you believe that this result would not be equitable and just to either party, according to the facts of this case, then you may take the value of Confederate money at the time of the making of this note, to be ascertained as above stated. Besides this, you may, if it does not violate the terms of the contract as agreed upon as before stated, take into consideration the value of the consideration received by Colonel Cutts from plaintiff for the note, and adjust the equities of the parties by this method; but you ought to discard this, if you believe the true agreement

Mordecai *vs.* Stewart.

of the parties was to pay the note in Confederate treasury notes.

" As to the credit entered on the note since the war, you will find out if you can what was the agreement of the parties in relation to the same, and carry it out ; and, if you are not satisfied from the evidence as to the intention of the parties, then you will find out, from the evidence, how this payment was made, and charge the plaintiff with the value of the same in our present currency."

To which charge plaintiff excepted.

The jury found a general verdict for the defendant, and thereupon the Court allowed defendant's attorneys to take an order to have said note and mortgage filed in the clerk's office as paid and satisfied, and plaintiff excepted.

Afterwards, during the term, and after a brief of the evidence had been agreed on and filed in office, upon request of plaintiff's attorneys, the Court passed an order requiring the defendant's attorneys to show cause, at Lee Superior Court, fourth Monday in January, then next, why a rule *nisi* for new trial in said case should not be granted, and " that the presiding Judge have leave to perfect the grounds of error alleged; and that the plaintiff's attorneys be allowed until that time to perfect their grounds for new trial."

The certificate of the Judge shows that said time and place were fixed by consent of counsel.

The Court adjourned 21st December, 1866.

On the 18th January, 1867, plaintiff's attorneys dismissed their said motion for new trial.   On the 22d January, 1867, the Judge returned to Scarborough & Goode a bill of exceptions which had been tendered, because the brief of evidence was not correct, and notified them that he would hear them at said Lee Superior Court, on the fourth Monday in January, and required that they should give notice to defendant's attorneys of the time and place of said hearing by serving them with a copy of said order.

Upon this order is this entry by the Judge : " The bill was at my office on the 19th inst., after I had left for Decatur

Court, as appears to me by proof." Defendant's attorneys acknowledged service of said order 24th January, 1867.

Defendant's attorneys protested against the Judge signing and certifying the bill of exceptions : 1st. Because it was too late : and, 2d. Because the plaintiff, at the time of the filing of this bill, had an application for a new trial pending in said case.

The Judge overruled these protests, because, as he says, the bill was at his office on the 19th January, while he was absent at Court, and because plaintiff's attorneys, when the bill of exceptions was tendered, signified their wish to dismiss their application for a new trial, which was allowed by the Court, and an order taken at Lee Superior Court, to which said case had been referred by consent of counsel, and then and there—to-wit, on the 30th January, 1867—signed and certified the bill of exceptions.

The bill of exceptions assigns for error "the charge of the Court, the rulings of the Court, and refusals to charge as aforesaid."

Attorneys for defendant in error moved to dismiss the bill of exceptions on the grounds stated in their protest. It was agreed that this motion and the whole cause be discussed together, and thus disposed of by the Court.

SCARBOROUGH & GOODE, COBB & JACKSON, attorneys for plaintiff in error.

H. K. McKAY and W. HAWKINS, attorneys for defendant in error.

HARRIS, J.

The awarding of a new trial in this case makes it unnecessary to decide the question of continuance moved by plaintiff in error.

As this cause does not come up upon a motion for a new trial, and refused, which would have opened it to the consideration of other questions connected with it, our adjudication is confined to what we deem an error in the presiding Judge's

Mordecai *vs.* Stewart.

charge, and which must have led the jury to make the verdict it did, and which seems to be unauthorized by any of the facts stated in the record.    We decline to pronounce any opinion upon any other of the instructions or rulings of the Judge, except as to that portion in the following words : " As to the credit entered on the note since the war, you will find out if you can' what was the agreement of the parties in relation to the same, and carry it out ; and if you are not satisfied from the evidence as to the intention of the parties, *then you are to find out from the evidence how this payment was made, and charge the plaintiff with the value of the same in our present currency."*

It seems to be a very clear principle, that where parties make an agreement, by which one pays and the other receives a certain amount, and which amount is credited on a promissory note, the note is satisfied or discharged only *pro tanto*, that is to the extent of the amount so paid, and that the remainder due on the note stands unaffected by the entry of such partial payment.

The amount thus credited cannot be enlarged, *in the absence of any agreement of the parties*, so as to extinguish a greater nominal amount of the note than the amount specified in the credit entered on the note.    To make the above idea more explicit, we hold that in this case the credit of $15,325 extinguished that amount only of the note, leaving the remainder due on the note, after this allowance, in nowise affected by such payment.

Judgment reversed.